IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WELDED CONSTRUCTION, L.P., *et al.*, | ) | Case No. 18-12378 (KG) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| WELDED CONSTRUCTION, L.P. AND WELDED CONSTRUCTION MICHIGAN, LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Adv. Pro. No. 19-50180 (KG) |
| | ) | |
| PRIME NDT SERVICES, INC., | ) ) | |
| | ) | |
| Defendants. | ) | Re: D.I. 7 |

## MEMORANDUM OPINION

### INTRODUCTION

Welded Construction, L.P. and Welded Construction Michigan, LLC (collectively, "Welded") brought this adversary proceeding against Prime NDT Services, Inc. ("Prime"). Prime moves to partially dismiss the First Claim and wholly dismiss the Second Claim against it in the two-claim complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), made applicable here by Federal Rule of Bankruptcy Procedure 7012 ("Bankruptcy Rule 7012") (the "Motion").

In the First Claim, Welded alleges that Prime breached the Subcontract (discussed below) in providing Welded with defective and non-conforming x-ray films for over

seventy discrete welds. In the Second Claim, Welded alleges that Prime breached warranties in the Subcontract by not performing its work in a good and workmanlike manner consistent with industry standards. Prime seeks partial dismissal of the First Claim and complete dismissal of the Second Claim. For the reasons that follow, the Court will deny the Motion in its entirety.

## JURISDICTION

The Court has jurisdiction to hear these matters under 28 U.S.C. §§ 1334(b) and 157(c)(1).[1] The First Claim for breach of contract and the Second Claim for breach of warranty are non-core matters. Notwithstanding, on a motion to dismiss the Court has the power to enter an order on non-core matters even if it has no authority to enter a final order on the merits. *Scher v. Essar Global Fund Ltd. (In re Essar Steel Minnesota LLC)*, 2019 WL 2264051, at *3 (Bankr. D. Del. May 23, 2019); *Giuliano v. Genesis Fin. Sols. (In re Axiant, LLC)*, 2012 WL 5614588, at *1 (Bankr. D. Del. Nov. 15, 2012) (citing *In re Trinsum Grp., Inc.*, 467 B.R. 734, 739 (Bankr. S.D.N.Y. 2012) ("After *Stern v. Marshall*, the ability of bankruptcy judges to enter interlocutory orders in proceedings ... has been reaffirmed....")); *Boyd v. King Par, LLC*, Case No. 11-CV-1106, 2011 WL 5509873, at *5 (W.D. Mich. Nov. 10, 2011) ("[U]ncertainty regarding the bankruptcy court's ability to enter a final judgment ... does not deprive the bankruptcy court of the power to entertain all pretrial proceedings"). Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] Prime does not consent to the Court's entry of a final judgment. Motion, p. 12. In deciding a motion to dismiss, the Court is not required to state findings of fact or conclusions of law. *See* Fed. R. Bankr. P. 7052 & Fed. R. Civ. P. 52(a)(3).

## BACKGROUND

Sunoco Marketing Partners & Terminals L.P. and Sunoco Pipeline L.P. (collectively, "Sunoco") own a pipeline project dubbed "Mariner East 2" (the "Project"). Compl. p. 1. The Project's objective is to create new pipeline capacity from Ohio through West Virginia and Pennsylvania to transport natural gas liquids to Sunoco's Marcus Hook Industrial Complex. Compl. pp. 1-2. Sunoco contracted with Welded for the latter to construct three separate pipeline "spreads" for approximately 152.6 miles of high pressure liquified natural gas pipeline. Compl. p. 2.

On January 6, 2016, Welded subcontracted with Prime to perform non-destructive examination ("NDE") x-ray weld inspections on the P1 and P5 spreads of the Project (the "Subcontract"). Compl. ¶¶ 1-2; p. 2; *see also* Compl. Ex. 1 (copy of Subcontract). Prime was to perform NDE x-rays to determine whether the completed welds connecting each length of pipe conformed with the Subcontract's quality standards. Compl. ¶ 15. Prime warranted that its workmanship and materials would be of proper quality, be performed in line with industry standards, meet Sunoco's specifications and be compliant with the Subcontract. Compl. ¶ 12 (citing Subcontract, Ex. G, Art. 16.0). Prime also represented that it would perform its work in a safe, workmanlike and competent manner in accordance with sound construction and Sunoco approved standards. Compl. ¶ 13 (citing Subcontract, Ex. G, Art. 20.0(1)).

Prime would perform an x-ray by exposing three films for each weld that Welded completed. Compl. ¶ 16. Prime would then inspect the x-ray films and report to Welded whether the weld was conforming. Compl. ¶ 17. If the weld was, Welded would backfill

the trench and continue construction. Compl. ¶ 18. Prime, not Welded, was required to perform QA/QC work on its x-ray films analysis to ensure compliance with the Subcontract. Compl. ¶¶ 19-20. Upon Prime's reporting, Welded provided Sunoco with the films for a third party to perform further QA/QC work. Compl. ¶ 21.

In or around June 2018, Sunoco discovered over seventy non-conforming discrete welds. Compl. ¶ 22. Prime never disputed the findings establishing its defective work. Compl. ¶ 24. Due to Prime's defective work, Welded had to excavate the seventy non-conforming welds and bring each into compliance. Compl. ¶¶ 25-26. During Welded's thirty days of remedial work, Welded had to halt its progress on the P1 spread, and thus fell far behind its production schedule. Compl. ¶ 28.

Welded hired additional workers from the week of August 19 through the week of October 21, 2018 to accelerate its work and meet the Project production schedule (the "Acceleration Costs"). Compl. ¶ 28. Although Welded remedied the welds, Welded incurred hefty labor, equipment and Acceleration Costs to recover lost time in the production schedule. Compl. ¶ 29. Sunoco then terminated Welded from the Project for cause citing Prime's defective work as a substantial factor. Compl. ¶ 31. On October 22, 2018, Welded filed for relief under Chapter 11 citing its Project termination as a substantial factor. Compl. ¶ 32. On March 27, 2019, Welded filed a two-count Complaint seeking at least five million dollars in damages. Compl. p. 8.

## LEGAL STANDARD

Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) is inextricably linked to Rule 8(a)(2), which provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." In *Twombly*, the Supreme Court ushered in the modern era of notice pleading under Rule 8(a)(2). The Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligations to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The *Twombly* standard is one of "plausibility" and not "probability" - "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* at 556.

The Supreme Court again addressed the Rule 8(a)(2) notice pleading standard in its *Iqbal* decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). The *Iqbal* decision clarifies that the *Twombly* plausibility standard applies to all civil suits filed in federal courts and identifies two "working principles" underlying the *Twombly* decision. *Id.* at 678. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief

will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

The United States Court of Appeals for the Third Circuit synthesized the preceding authorities in its *Fowler* decision:

> [A]fter *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts. As the Supreme Court instructed in *Iqbal*, '[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."' This 'plausibility' determination will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'

*Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

## DISCUSSION

### I. First Claim – Breach of Contract

#### A. Background

In the Motion, Prime argues that Welded's demand for Acceleration Costs are consequential damages that must be dismissed because the Subcontract between Welded and Prime limits the recoverability of such damages. Motion, ¶ 2. The Acceleration Costs are consequential damages because they stem from increased construction and delay

6

costs that Welded incurred while remedying Prime's alleged defective work. Motion, ¶ 13. The Subcontract bars all consequential damages unless such damages are the result of the gross negligence and willful misconduct of the "subcontractor's project manager, project engineering manager, construction manager and superintendent for subcontractor, while working on the project." Motion, ¶ 22 (citing Subcontract, Ex. G, Art. 15.0). Prime posits that it only employed technicians and assistants. Motion, ¶¶ 22-23. Also, Welded did not plead that any of Prime's project manager, project engineering, construction manager, or superintendent acted in a grossly negligent manner or engaged in willful misconduct. Motion, ¶ 23. Thus, according to Prime the Subcontract's consequential damages exception does not apply.

In its Opposition, Welded argues that the parties' intent is ambiguous. It is unclear whether the specific job titles mentioned in the consequential damages provision only apply to persons with such titles. Pls.' Opp'n to Prime NDT Servs., Inc.'s Partial Mot. to Dismiss Pls.' Compl., ¶ 19 ("Pls.' Opp'n"). The inclusion of "industry-standard job titles demonstrate[] the parties' manifested intent that Prime would designate supervisors or managers for the Project—the individuals who would be responsible for ensuring the quality of the work and quality of the QA/QC program." Pls.' Opp'n, ¶ 19.

Welded claims it is entitled to discovery to determine who at Prime worked on the Project. Pls.' Opp'n, ¶ 19. Regardless of titles, "there must have been individuals tasked with overseeing Prime's work on the Project. Pls.' Opp'n, ¶ 19. Prime should not be able to shirk its Subcontract obligations by "conferring management personnel with different titles." Pls.' Opp'n, ¶ 20. Welded pleaded facts alleging that Prime personnel not only

performed x-rays and consequent film analysis but also quality assurance and quality control ("QA/QC") work to ensure compliance before reporting the results to Welded. Pls.' Opp'n, ¶ 15; *see also* Compl. ¶ 19.

Welded adds that the warranty provision requires Prime to indemnify Welded "from and against all damages, losses, costs and expenses which are incurred by reason of Subcontractor's error." Pls.' Opp'n, ¶ 21 (citing Subcontract, Ex. G, Art. 16.0). The provision's plain language does not provide a consequential damages limitation and so Welded is entitled to its Acceleration Costs. Pls.' Opp'n, ¶ 21.

In its Reply, Prime responds that it only supplied crews of two to four technicians and assistants. Prime NDT Servs., Inc.'s Reply in Supp. of its Partial Mot. to Dismiss Pls.' Compl., ¶ 6 (the "Reply"). A technician or assistant is not a project manager, project engineering manager, construction manager or a superintendent for contractors. Reply, ¶¶ 6-7. Thus, the Subcontract bars Welded from recovering Acceleration Costs.

Prime also counters that the warranty provision concerning indemnification is inapplicable. The last sentence states that "[t]he warranties set forth herein shall not affect or limit any other rights or remedies provided by the Contract." Reply, ¶ 11 (citing Subcontract, Ex. G, Art. 16.0).

### B. Analysis

The Subcontract's provision on consequential damages states in relevant part:

> SUBCONTRACTOR AGREES, HOWEVER, TO INDEMNIFY CONTRACTOR AND COMPANY FOR CONSEQUENTIAL DAMAGES, SUCH AS LOSS OF USE AND LOSS OF REVENUE, TO THE EXTENT THEY ARE CAUSED BY THE GROSS NEGLIGENCE AND WILLFUL MISCONDUCT OF SUBCONTRACTOR'S PROJECT MANAGER,

> PROJECT ENGINEERING MANAGER, CONSTRUCTION MANAGER, AND SUPERINTENDENT FOR SUBCONTRACTOR, WHILE WORKING ON THE PROJECT. GROSS NEGLIGENCE AND WILLFUL MISCONDUCT SHALL BE DEFINED AS THE INTENTIONAL FAILURE TO PERFORM A MANIFEST DUTY IN RECKLESS DISREGARD OF THE CONSEQUENCES AS AFFECTING THE LIFE OR PROPERTY OF ANOTHER.

Motion, ¶ 9 (citing Compl., Ex. 1). In contract interpretation, "the language is to be given its plain and ordinary meaning." *Mesabi Metallics Co. LLC v. Cleveland-Cliffs Inc. (In re Essar Steel Minnesota LLC)*, 590 B.R. 109, 117 (Bankr. D. Del. 2018) (citation omitted). A court should interpret the contract "in a manner that accords the words their fair and reasonable meaning and achieves a practical interpretation of the expressions of the parties." *Solus Alt. Asset Mgmt. LP v. Delphi Auto PLC (In re DPH Holdings Corp.)*, 553 B.R. 20, 27 (Bankr. S.D.N.Y. 2016) While a contract's plain meaning should be the point of departure, "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Id.* (citation omitted). "[A] contract should not be construed [to] disregard[] common sense in favor of formalistic literalism that defies logic." *Id.* (internal quotations omitted) (citation omitted). If the contract is unambiguous, the plain meaning carries.

Prime's interpretation of the Subcontract, while convenient, is misplaced for two reasons. First, Prime's reading of the consequential damages provision shirks commercial practicality. It is undisputed that the Acceleration Costs are consequential damages. The Subcontract bars nearly all consequential damages. A narrow exception exists. Consequential damages are recoverable if such damages were caused by the gross negligence and willful misconduct of Prime's project manager, project engineering

manager, construction manager or a superintendent for subcontractor. The Subcontract only provides for Prime to utilize "certified technicians" and "assistants." *See* Subcontract, Ex. A. It appears that Prime only used personnel with those titles. On the surface, Prime's reliance on the contractual language is persuasive.

However, the Court will not interpret a contract in a formally literalistic way that ignores the practical interpretation of the parties' reasonable expectations. Welded sufficiently pleaded that the Subcontract required Prime to perform, *inter alia*, QA/QC work to ensure its x-rays complied with certain terms. Compl. ¶¶ 15-20. Prime's obligation to perform QA/QC work implies that someone would oversee or manage the technicians and assistants performing the x-rays and analyzing the films. Whether Prime utilized any of its personnel bearing the title or responsibility of a project manager, project engineering manager, construction manager or a superintendent for subcontractor requires further fact finding. It strains credulity, however, to find that Prime did not employ supervisors in its work for Welded, particularly at this stage of the adversary proceeding. Discovery will enable the Court to rule with certainty. The Court on this point is exercising its "judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Second, the Subcontract's consequential damages provision has a narrow but ambiguous exception. A contract provision "contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. . . . [C]ontractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Baran v. George Weston Bakeries, Inc.*, 2019 WL 126783, at *3 (Pa. Super. Ct. Jan. 7, 2019) (citing *Ramalingam v. Keller*

*Williams Realty Grp., Inc.*, 121 A.3d 1034, 1046 (Pa. Super. 2015));[2] *see also DPH Holdings*, 553 B.R. at 26 (Under New York law, a contract is ambiguous if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (citation omitted).

The consequential damages provision may be ambiguous given the totality of these facts. Here, the consequential damages' exception is subject to more than one reasonable interpretation. For one, as Prime suggests, the reference to "subcontractor's project manager, project engineering manager, construction manager, and superintendent for subcontractor, while working on the project" can mean to apply only to such persons. Subcontract, Ex. G, Art. 15.0. However, it can also apply to any person who stands in the shoes of, or assumes the role of a manager or overseer of the Subcontractor's performance. This interpretation is reasonable because Welded subcontracted Prime to perform x-rays, analyze consequent films and perform QA/QC work before reporting. A project manager and a superintendent are similar in that they oversee or direct activities. [3] *See Black's Law Dictionary* (11th ed. 2009) (defining a superintendent as a "person with the power to direct activities; a manager"). Welded

---

[2] The Subcontract is subject to Pennsylvania law. Subcontract, Ex. G, Art. 10.0.
[3] The consequential damages provision also provides for engineering and construction managers. However, if no such work was being done by Prime, why did the parties contract to include such managers? It could have been an inadvertent mistake. It could be that the specific titles are merely examples insinuating anyone in a managerial role. Nevertheless, that is not a question for today but a question to be asked after further discovery.

sufficiently pleaded facts showing that Prime was contractually obligated to perform QA/QC work before submitting its x-ray films findings. Thus, discovery is required to determine whether any of the persons Prime employed fell within the narrow exception. Discovery may also yield what a project manager or superintendent of a subcontractor means within the parties' industry and practice.

The Court also finds that the Subcontract's Warranty provision does not abrogate Prime's rights under the consequential damages provision as Welded suggests. Article 16.0 clearly states that "[t]he warranties set forth herein shall not affect or limit any other rights or remedies provided by the Contract . . ." Subcontract, Ex. G, Art. 16.0.

Welded sufficiently pleaded a breach of contract claim with the possible recovery of consequential damages. Thus, the Court denies the Motion as it relates to the barring of Acceleration Costs.

## II. Second Claim – Breach of Warranty

### A. Background

In the Motion, Prime argued that Welded failed to state a claim upon which relief can be granted. "Subcontractor's warranty for services provided shall extend for eighteen (18) months from the final completion of Subcontractor's scope of work." Motion, ¶ 24 (citing Subcontract, Ex. G, Art. 16). When Welded performed remedial work, Prime's work was not completed. Thus, no warranty was in place when Welded incurred any purported damages resulting from Prime's alleged breach.

In its Opposition, Welded argues that the warranty provision is silent as to when the warranty commenced. The plain language provides the warranty commenced on the

Subcontract's effective date of January 6, 2016. Prime's "warranty for services provided *shall extend* for eighteen (18) months from the final completion of Subcontractor's scope of work." Pls.' Opp'n, ¶ 23 (citing Subcontract, Ex. G, Art. 16) (original emphasis). Welded argues that the words "shall extend" means that "the parties agreed that [the warranty period] would be *further extended* for eighteen (18) months from the completion of Prime's work," indicating the warranty was effective at some prior time. *See* Pls.' Opp'n, ¶ 23 (original emphasis). The term "extend" refers back to the Subcontract's effective date, rendering the warranty provision effective as of the dates of Prime's alleged breaches.

Welded adds that the parties' intent of when the warranty commenced is ambiguous. It is unclear "whether or not this warranty provision was intended to be triggered by each completed x-ray [] or only to cover damages accrued during the eighteen (18) months after Prime completed all of its work." Pls.' Opp'n, ¶ 25.

In its Reply, Prime counters that the Subcontract does not provide that the warranty begins on January 6, 2016. Reply, ¶ 9. Welded's reading of "further extended" into the warranty provision is "imaginary." Reply, ¶ 9. The provision does not say "further." Reply, ¶ 9. Moreover, the word "from" in "shall extend for eighteen (18) months from the final completion" means "the starting point is the final completion of Prime's work." Reply, ¶ 10. Welded pleads that it incurred damages before Prime finished its work and so the warranty was not yet effective. Thus, according to Prime the Second Claim fails.

### B. Analysis

At this juncture, the issue is solely temporal: when did the warranty period begin and whether Welded pleaded sufficient facts that the warranty applied as of the date of Prime's alleged breaches. The Subcontract provides in relevant part: "Subcontractor's warranty for services provided shall extend for eighteen (18) months from the final completion of Subcontractor's scope of work." Subcontract, Ex. G., Art. 16.0.

The warranty provision does not state when the warranty commenced. The words "shall extend" could mean what Prime suggests: the warranty commenced when Prime's work was completed and it would run for eighteen months from such date. The language could also mean what Welded suggests: the warranty began at some period prior to Prime's work being complete such as the Subcontract's effective date of January 6, 2016 and only extend for up to eighteen months when Prime completed its work. Further discovery is appropriate to determine, *inter alia*, the parties' intent and how the parties' industry apply warranty provisions.

Welded sufficiently pleaded a breach of warranty claim. Thus, the Court denies the Motion for dismissal of the Second Claim.

## CONCLUSION

For the foregoing reasons, the Court will deny Prime's Motion in its entirety. The Court directs Welded to prepare and circulate a form of order which reflects the Court's rulings and thereafter submit the proposed order to the Court.

Dated: August 13, 2019

_____
KEVIN GROSS, U.S.B.J.